834 A.2d 1178 (2003)
B.K., A Minor, by S.K. and M.K., His Guardians, and S.K. and M.K. in Their Own Right, Appellants,
v.
CHAMBERSBURG HOSPITAL and Michael Grossberg, M.D., Appellees.
Superior Court of Pennsylvania.
Argued January 14, 2003.
Filed October 17, 2003.
*1179 Neil J. Rovner, Harrisburg, for appellant.
Thomas Chairs, Camp Hill, for Grossberg, appellee.
BEFORE: STEVENS, GRACI, and OLSZEWSKI, JJ.
*1180 OPINION BY STEVENS, J.:
¶ 1 This is an appeal from the Court of Common Pleas of Franklin County's pre-trial order granting summary judgment to one defendant, Appellee Chambersburg Hospital. On appeal, Appellants, B.K. and his parents S.K. and M.K., contend that the trial court erroneously ruled that their intended medical expert lacked the expertise necessary to testify at trial. We reverse and remand.
¶ 2 In the early morning hours of December 31, 1992, an ambulance brought thirteen month old B.K. to the Chambersburg Hospital Emergency Room to treat him for an apparent fever-related seizure. Emergency Room personnel immediately paged Michael Grossberg, M.D. for a consult in pediatric treatment, but nearly an hour of unsuccessful treatment passed before Dr. Grossberg showed. Thirty minutes later, Dr. Grossberg administered Phenobarbital intravenously, which finally brought B.K.'s seizure under control ninety minutes after B.K.'s emergency room arrival.
¶ 3 Appellants filed a Civil Complaint against both Chambersburg Hospital and Dr. Grossberg, claiming that the staff's ineffective treatment and Dr. Grossberg's belated response were malpractice. The Complaint further alleged that the malpractice caused B.K. to suffer onset of a behavioral disorder known as Pervasive Developmental Disorder (PDD), characterized by, inter alia, regressed speech development.
¶ 4 Shortly before trial, Chambersburg Hospital filed a Motion for Summary Judgment based on its position that Appellants' proposed expert, board certified pediatrician Richard Bonforte, M.D., was not qualified as an expert witness in emergency room medicine. After an in camera hearing, the trial court precluded Dr. Bonforte from testifying because "he does not specialize in emergency medicine, is not board certified in emergency medicine, and does not work full time directly on the emergency room floor caring for patients." Trial Court Opinion dated 6/11/99 at 2. The ruling left Appellants without an expert in its case against Chambersburg Hospital, and the trial court accordingly entered a pretrial Order granting Chambersburg Hospital's Motion for Summary Judgment. The case against remaining defendant Dr. Grossberg proceeded to trial, where Dr. Grossberg won judgment in his favor. This appeal challenging the order granting Summary Judgment in favor of Chambersburg Hospital followed.
¶ 5 Appellants raise two related issues:
I. WHETHER IT IS AN ABUSE OF DISCRETION AND CONTRARY TO PENNSYLVANIA LAW TO REQUIRE THAT A PEDIATRICIAN MUST BE EITHER BOARD CERTIFIED IN EMERGENCY ROOM MEDICINE, OR HAVE WORKED FULL TIME IN AN EMERGENCY ROOM TO TESTIFY AS TO THE STANDARD OF CARE FOR TREATING A PEDIATRIC SEIZURE?
II. DID THE COURT ABUSE ITS DISCRETION BY HOLDING THAT DR. BONFORTE, A BOARD CERTIFIED PEDIATRICIAN, ACTIVE IN EMERGENCY ROOMS WAS MERELY A "HOSPITAL ADMINISTRATOR" AND NOT QUALIFIED TO TESTIFY AS TO THE STANDARD OF CARE FOR TREATING A PEDIATRIC SEIZURE BY AN EMERGENCY ROOM PHYSICIAN?
Brief for Appellants at 4.
¶ 6 Initially, we must determine whether the appeal from the pretrial Order *1181 granting pretrial Summary Judgment in favor of Chambersburg Hospital is properly before this Court.[1] In general, an appeal may be taken as of right only from a final order, see Pa.R.A.P. 102, which is defined, in relevant part, as an order that disposes of all claims and all parties. See Pa.R.A.P. 341(a); K.H. v. J.R., 573 Pa. 481, 826 A.2d 863 (2003). "Thus, in an action involving multiple defendants...an order granting summary judgment as to one party is treated as appealable as of right only after the disposition of claims involving the remaining parties. See generally Gutteridge v. A.P. Green Servs., Inc., 2002 PA Super 198, 804 A.2d 643, 650 (Pa.Super.2002) (stating that an order settling a case as to the remaining parties rendered the prior orders granting summary judgment final under Rule 341)." K.H., 573 Pa. at 490, 826 A.2d at 869. Under this interpretation, the pretrial order granting summary judgment for Chambersburg Hospital became appealable as of right after post trial judgment was entered in favor of remaining defendant Dr. Grossberg.
¶ 7 Preservation of Appellants' challenge to the pretrial summary judgment order, moreover, did not depend upon their first including the claim in a post-trial motion with the trial court. The note to Pa.R.C.P. 227.1 is consistent with this conclusion, as it instructs that a motion for post-trial relief may not be filed to orders disposing of, inter alia, motions for summary judgment or other proceedings which do not constitute a trial. The note retained this instruction even after an amendment to Rule 227.1(b)(2) provided "Post-trial relief may not be granted unless the grounds therefore, ...(2) are specified in the motion.... Grounds not specified are deemed waived...." The Explanatory Comment to subdivision (b) explains, however, that the new waiver provision in (b)(2) responds to Yudacufski v. Commonwealth of Pa., Dept. of Transportation, 499 Pa. 605, 454 A.2d 923 (1982), which held appealable a challenge to a pretrial order denying a motion for change of venue not included in a post-trial motion because the Rules `do not specifically include a requirement that pre-trial rulings must be raised in post-trial motions in order to be preserved.' "Subdivision (b)," the Explanatory Comment continues, "now contains such a provision."
¶ 8 Yet, the motion at issue in Yudacufski was not among the motions identified in the Rule 227.1 note as excluded from post-trial motion practice. Furthermore, jurisprudence following the amendment to subdivision (b) has reaffirmed that "it is unnecessary to include a prior order granting summary judgment in post-trial motions for purposes of issue preservation...." K.H., 573 Pa. at 495, 826 A.2d at 872 (holding that plaintiffs' inclusion in post-trial motions of a pretrial summary judgment order was done "in an abundance of caution," and was preserved even though plaintiffs appealed from the subsequent post-trial judgment entered against the remaining defendants). See also, Swift v. Milner, 371 Pa.Super. 302, 538 A.2d 28 (1988) (rejecting the position that appellants waived issue regarding pre-trial partial judgment on the pleadings (among the motions identified in Rule 227.1, note) by failing to include issue in post-trial motion).
¶ 9 Consequently, the order granting Chambersburg Hospital's motion for summary judgment became final and appealable when judgment was entered after the verdict in favor of remaining defendant Dr. Grossberg. Appellants preserved the order *1182 in a timely filed notice of appeal, which clearly identifies the order at issue and, thus, the scope of the appeal. The matter is, therefore, ripe for our review.
¶ 10 Essentially, Appellants' two issues coalesce to argue that the court committed reversible error when it precluded Appellants' proposed expert witness, Dr. Bonforte, from testifying as to the standard of emergency room care for a pediatric seizure. The decision of the trial judge to admit expert testimony may be reversed only where there has been an error of law or an abuse of the substantial discretion vested in the trial court. Tiburzio-Kelly v. Montgomery, 452 Pa.Super. 158, 681 A.2d 757, 764 (1996). The Pennsylvania Supreme Court has repeatedly held that the standard for evaluating the qualifications of an expert witness under Pennsylvania law is a liberal one:
The test to be applied when qualifying an expert witness is whether the witness has any reasonable pretension to specialized knowledge on the subject under investigation. If he does, he may testify and the weight to be given to such testimony is for the trier of fact to determine.
* * *
In the area of medicine, specialties sometimes overlap and a practitioner may be knowledgeable in more than one field. "Different doctors will have different qualifications, some doctors being more qualified than others to testify about certain medical practices. It is, however, for the jury to determine the weight to be given to expert testimony, in light of the qualifications shown by the expert witness."
Bindschusz v. Phillips, 771 A.2d 803, 807, 808-809 (Pa.Super.2001) (citations omitted) (emphasis in original).
¶ 11 Under this liberal standard, we examine whether Dr. Bonforte possessed sufficiently specialized knowledge in emergency care of pediatric seizures to testify as an expert on the matter. Contrary to defense counsel's position at the qualifications hearing that "there is nothing within the four corners of [Dr. Bonforte's] CV to indicate he has any experience in emergency medicine," Dr. Bonforte's curriculum vitae specified two years' experience as an emergency room physician, four more years' experience in the 1980's as a member of the "Special Emergency Room Oversight Committee" at New York's Beth Israel Medical Center, and even listed a published article in a journal of children's medicine on the related topic of convulsions as a presenting sign of infection.
¶ 12 At the hearing itself, Dr. Bonforte elaborated on his qualifications with regard to standards and protocols of emergency care, with particular interest in pediatrics:
COUNSEL: And how long were you division chief of pediatric ambulatory care?
DR. BONFORTE: Roughly ten years.
Q: Can you tell us what years?
A: I think it was probably from 1972 to 1982.
Q: And from 1972 to 1982 as that in charge of ambulatory care, what was your knowledge and involvement in emergency room treatment?
A: I had two areas of responsibility. One was the general outpatient department and the second was to include our pediatric emergency room at the hospital.
Q: Okay. And tell me what your function was with regard to pediatric patients in the emergency room.
A: I was directly responsible for direct oversight of all the children that came into the unit, supervising the staff that *1183 worked on that unit, responsible for all the quality of assurance of care, setting standards of care for that area and developing protocols with staff.
Q: By developing protocols for the emergency room, what does that mean?
A: Well, any of the treatment procedures that were done in that area, policies and procedures all were reviewed by committee and subject to my approval.
* * *
Q: Now, from 1982 on what did you do?
A: Well, [in] 1982 I assumed responsibilities as chairman of pediatrics in what was then a major affiliate hospital of Mount Sinai, Beth Israel in New York City.
Q: What was your function there?
A: The same type of responsibilities but in a much broader scope. So I was responsible for all of the pediatric care in that institution which included inpatient, outpatient in the emergency room.
* * *
Q: Would you be able to enforce the emergency room physicians if you didn't feel they were doing proper care of children?
A: Yes.
Q: How would you do that?
A: Well, we would either, you know, through oversight and review, obviously I had people working directly under me to do a lot of specific paperwork and stuff, but I was responsible directly and had the authority to hire, fire and staff, staff recommendation.
Q: How about the actual care, oversight of the care that was provided as opposed to the staffing?
A: Oversight of the care, same type of things in terms of review of problems and procedures. If there were difficulties with care and any care issues that came up, that responsibility was on my desk.
Q: Did you have any teaching responsibilities?
A: Yes.
Q: And who did you teach?
A: We had a 26 to 28 man residency program that I was directly responsible for and ran, was program director as well [for] medical students.
Q: Did you make rounds with the residents through the emergency room?
A: Yes.
Q: Did you instruct emergency room procedures?
A: Yes.
Q: How long was that period of time?
A: That was from 1982 up until the end of this year, so 1998, 16 years.
Q: And in 1998 did you begin doing
A: Well, I recently assumed responsibilities as chief of pediatrics in another facility, Jersey City Medical Center, [with] essentially the same type of responsibilities I had as chairman, responsible for all of the pediatric care and major urban, inner city hospital [sic]. I have a one manone person who works in that emergency room who is directly physically there, and then he reports particularly to me, and I am responsible for all the protocols, oversight, requests, and supervision of the house staff under their supervision of medical students.
* * *
Q: And the one person who reports to you, what is that person's background?
A: He's a pediatric emergency specialist.
Q: Now, Doctor, the issue that we're involved with here is treating a child with prolonged seizures, status epilepticus. *1184 Is that, strictly speaking, an emergency room function?
A: It's not strictly an emergencyit's a pediatric emergency, but it's not strictly an emergency room function. Those are things that we would treat in the outpatient department, treat in the inpatient unit in the hospital.
Q: Is the standard of treatment of seizures in a child any different whether it's pediatrician, an emergency room, inpatient, outpatient?
A: No.
Q: Is it the same type of protocol, the same standard of care that's followed?
A: Yes.
THE COURT: Doctor, let me ask you this then. If the emergency room did it the same, then they wouldn't need to call a pediatrician in, is that your testimony if their standard of care is the same?
DR. BONFORTE: Let me put it this way. The standard of care should be done properly if they know what to do, correct.
N.T. 3/16/99 at 6-7, 9-13. In a later response to the trial court's intervening question, Dr. Bonforte again testified about the responsibilities of emergency room personnel and their relationship with pediatric specialists.
COUNSEL: In this particular case the Judge has asked why you might want to have another physician there to come in. Let me ask it to you this way. Are emergency room doctors that you see, are they trained in how to treat pediatric seizures?
DR. BONFORTE: They should be trained in how to take care of seizures, yes.
THE COURT: Then, Doctor, why would we need a pediatrician and explain that to me.
DR. BONFORTE: Simply because difficulties in setting up IV's, techniques and dealing with children, how to handle children, how to draw blood from children, how to deal with families, very different techniques and skills.
N.T. at 15-16.
¶ 13 Despite this account of Doctor Bonforte's experience in administering standards of care for emergency rooms and pediatrics, and his unequivocal opinion that emergency room personnel should know how to treat pediatric seizures, the trial court was concerned that Dr. Bonforte had no recent experience as a treating physician in the emergency room.
THE COURT: Well, what I'm having trouble with, Doctor, and I'll tell you while the attorneys are here, you are a pediatrician and so far what I've heard is oversight of there.
I have difficulty as a judge having someone come in who hasn't walked in those shoes, and if you came in here and told me you work in the emergency room and handled cardiac arrest, fractured legs, black eyes and stuff, I'm going to ask you, and I'll let [plaintiff's counsel] continue, did you ever work for any extensive period of time other than when you stated through your residency as an emergency medical room doctor that handled every patient that came through the doors?
N.T. at 13. Ultimately, it was on this basis that the trial court precluded Dr. Bonforte from testifying.
¶ 14 The trial court erred when it precluded Dr. Bonforte. Dr. Bonforte's curriculum vitae and testimony on both his practicing and supervisory experience clearly demonstrated specialized knowledge of the disputed issue between the parties, and confirmed his qualifications as an expert under the governing standard of review. His impressive career in nationally *1185 renowned hospitals has been one of assuming direct responsibility for setting emergency room standards of care, particularly for child patients, and of ensuring that emergency room staffs meet such standards. The interplay between emergency rooms and pediatric departments was also among his overseeing duties. Based on this experience, his opinion was unequivocal that an emergency room staff should know how to treat a pediatric seizure like B.K.'s without consulting a pediatrician.
¶ 15 As a treating physician earlier in his career, Dr. Bonforte was primarily a pediatrician in a hospital setting. This fact, coupled with but a two-year stint as an emergency room treating physician thirty years before the matter at hand moved the trial court to its ruling. The doctor's earlier history as a treating pediatrician, however, does not negate his most recent twenty-five years of supervisory experience with the very standards of care that drive the crucial inquiry of this case. The touchstone of expert qualification is, again, "specialized knowledge." To preclude scholars, authors, instructors, and other authorities from qualifying as experts simply because they teach or supervise a craft rather than practice the craft flies in the face of the "specialized knowledge" standard. Indeed, it is inconceivable that one could meaningfully supervise a skilled practice without specialized knowledge of the practice.
¶ 16 The record shows that Dr. Bonforte's supervisory experience gave him the requisite specialized knowledge of emergency room care of childhood seizures to qualify him as an expert witness in the case against Chambersburg Hospital. Whether an emergency room treating physician may possibly disagree with and discredit Dr. Bonforte's opinion is a matter for a jury, informed by cross-examination and opposing experts, to resolve. Altogether precluding Dr. Bonforte from testifying, however, is unwarranted under the governing standard of review, and so doing constituted reversible error. Accordingly, we must reverse the order granting summary judgment in favor of Chambersburg Hospital for Appellants' failure to procure an expert, and remand for proceedings consistent with this decision.
¶ 17 Order reversed. Remanded for proceedings consistent with this decision. Jurisdiction relinquished.
NOTES
[1] We may raise the issue of appealability sua sponte because it affects our jurisdiction. Morgan Trailer Mfg., Co. v. Hydraroll, Ltd., 804 A.2d 26, 29-30 (Pa.Super.2002).