Beverly WEXLER, Appellant,

v.

Paul J. HECHT, M.D. and Donald W. Mazure, M.D., Appellees.

Superior Court of Pennsylvania.

Argued Dec. 10, 2003.
Filed April 5, 2004.

Lee S. Bender, Philadelphia, for appellant.

Christine Guiliano, Philadelphia, for appellees.

BEFORE: JOHNSON, LALLY–GREEN, and POPOVICH, JJ.

OPINION BY LALLY–GREEN, J.:

¶ 1 In this medical malpractice action, Appellant, Beverly Wexler, appeals from the summary judgment order entered on December 18, 2002. We affirm.

¶ 2 A brief summary of the factual and procedural history of the case is as follows. On January 18, 1998, Appellant underwent bunion-removal surgery and related procedures. Defendant/Appellee, Dr. Paul J. Hecht, performed the operation. Dr. Hecht is a board-certified orthopedic surgeon.

¶ 3 Appellant complained that Dr. Hecht's surgery caused her foot condition to worsen.[1] On November 3, 1999, Appellant filed a medical malpractice action against Dr. Hecht.

¶ 4 The case proceeded through discovery, including the production of expert reports. Appellant presented an expert report from Dr. Lawrence Lazar, D.P.M. (Doctor of Podiatric Medicine). Dr. Lazar is a podiatrist, and is licensed to practice in the District of Columbia, Maryland, and North Carolina. Dr. Lazar is not a licensed medical doctor, an M.D., or an orthopedic surgeon, but he is certified by the American Board of Podiatric Surgery.

¶ 5 Dr. Lazar's report explains how Dr. Hecht's treatment deviated from the "normal standard of care" in many respects. The report, however, does not further identify whether the "normal standard of care" is the standard of podiatric surgeons like himself, or orthopedic surgeons like Dr. Hecht. Similarly, Dr. Lazar references "the scientific literature" and unnamed medical textbooks to support his conclusion that Dr. Hecht deviated from the "normal standard of care." Again, however, Dr. Lazar does not indicate whether these texts set forth the standards relating to podiatric surgeons or to orthopedic surgeons.

¶ 6 Dr. Hecht filed a motion *in limine* to exclude Dr. Lazar's expert report. Dr. Hecht argued that Dr. Lazar was unqualified to provide an expert opinion under both the common law and the newly enacted Medical Care Availability and Reduc-

---

1. Appellant further alleged that subsequent corrective surgical procedures, performed by a podiatrist, largely improved her condition.

tion of Error Act ("MCARE Act"), 40 P.S. § 1303.101 *et seq.*

¶ 7 The trial court held a hearing on December 17, 2002. The court concluded that Dr. Lazar lacked the sufficient background, training, and experience to render a competent expert opinion under the common law. The court expressly ruled that its decision was **not** based on the MCARE Act. N.T., 12/17/2002, at 22.

¶ 8 At the end of the hearing, the court granted Dr. Hecht's motion *in limine.* Because Appellant now lacked an expert to support her medical malpractice action, Dr. Hecht made an oral motion for summary judgment. The court granted this motion as well. The court docketed these orders on December 18, 2002. This timely appeal followed.[2]

¶ 9 Appellant raises three issues on appeal:

Did the trial court err and abuse its discretion in finding that the Appellant's medical expert, a Podiatrist, was not qualified to testify as an expert against an Orthopedist in a medical malpractice case where:

A. The specialties overlap in practice, the podiatrist knows, is aware and can testify as to the standard of care in the field of Orthopedics based on his own training and education, and the subsequent treating physician who did two repair surgeries on the Appellant is a Podiatrist?

B. Where under the MCARE Act § 1303.512(c)(1),(2),(3), the Appellant's Podiatrist Expert practices in a subspecialty which has a substantially similar standard of care as the defendant orthopedist and is board-certified in a similar approved board as the defendant?

C. The trial court erred and abused its discretion by failing to permit Appellant's expert to testify regarding his qualifications at the Motion *in Limine* Hearing despite Appellant's urging and request to hear from the expert in person?

Appellant's Brief at 4.

¶ 10 First, Appellant argues that the trial court abused its discretion by excluding Dr. Lazar's opinion under common law. Our standard of review is as follows:

"Whether a witness has been properly qualified to give expert witness testimony is vested in the discretion of the trial court." *West Philadelphia Therapy Center v. Erie Ins. Group,* 2000 PA Super 94, 751 A.2d 1166, 1167 (Pa.Super.2000) (citation omitted). It is well settled in Pennsylvania that the standard for qualification of an expert witness is a liberal one. *Rauch v. Mike–Mayer,* 2001 PA Super 270, 783 A.2d 815 (Pa.Super.2001). When determining whether a witness is qualified as an expert the court is to examine whether the witness has any

---

**2.** On January 16, 2003, the trial court ordered Appellant to file a Concise Statement of Matters Complained of on Appeal under Pa.R.A.P. 1925. Appellant filed a timely Concise Statement on January 24, 2003. Appellant raised five issues in the Concise Statement. The first four issues in the Concise Statement correspond to Issue "A" in Appellant's brief on appeal. The fifth issue in the Concise Statement corresponds to Issue "C" in Appellant's brief.

The trial court filed its Rule 1925 opinion on August 14, 2003. In this opinion, the trial court ruled for the first time that Appellant's expert report was inadmissible under the MCARE Act. Trial Court Opinion, 8/14/2003, at 5–7. Appellant's response to this opinion is set forth in Issue "B" of her brief on appeal.

reasonable pretension to specialized knowledge on the subject under investigation. *Miller v. Brass Rail Tavern*, 541 Pa. 474, 664 A.2d 525 (1995). *George v. Ellis*, 2003 PA Super 121, 820 A.2d 815, 817 (Pa.Super.2003). The determination of whether a witness is a qualified expert involves two inquiries:

> When a witness is offered as an expert, the first question the trial court should ask is whether the subject on which the witness will express an opinion is 'so distinctly related to some science, profession, business or occupation as to be beyond the ken of the average layman.' ... If the subject is of this sort, the next question the court should ask is whether the witness has 'sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth.'

*McDaniel v. Merck, Sharp & Dohme*, 367 Pa.Super. 600, 533 A.2d 436, 440 (Pa.Super.1987), *appeal denied*, 520 Pa. 589, 551 A.2d 215 (1988), *and by Petition of Merck, Sharp & Dohme*, 520 Pa. 589, 551 A.2d 216 (Pa.1988) (quoting *Dambacher v. Mallis*, 336 Pa.Super. 22, 485 A.2d 408, 415 (Pa.Super.1984)). *Kovalev v. Sowell*, 2003 PA Super 432, ¶ 7, 839 A.2d 359.

¶ 11 It is undisputed that expert testimony was necessary both to establish the standard of care for the surgical procedure at issue, and to establish that Dr. Hecht breached that standard of care. *Toogood v. Owen J. Rogal, D.D.S., P.C.*, 573 Pa. 245, 824 A.2d 1140, 1145 (2003) (opinion announcing the judgment of the court), *citing, Hightower–Warren v. Silk*, 548 Pa. 459, 698 A.2d 52, 54 (1997). It is also undisputed that the relevant standard of care is the standard applicable to orthope-

dic surgeons, because the procedure at issue was performed by an orthopedic surgeon. *See, Yacoub v. Lehigh Valley Medical Assocs., P.C.*, 805 A.2d 579, 592 (Pa.Super.2002). The question becomes whether Dr. Lazar was qualified to render an opinion as to the standard of care employed by orthopedic surgeons.

■ ¶ 12 Generally, "[i]n the area of medicine, specialties sometimes overlap and a practitioner may be knowledgeable in more than one field. Different doctors will have different qualifications, some doctors being more qualified than others to testify about certain medical practices." *B.K. v. Chambersburg Hospital*, 2003 PA Super 386, ¶ 10, 834 A.2d 1178, *quoting, Bindschusz v. Phillips*, 771 A.2d 803, 809 (Pa.Super.2001). Where the expert is qualified to testify, the weight of that testimony is for the jury to determine. *Id.*

■ ¶ 13 On the other hand, medical experts may be unqualified to testify about the standards of care applicable in certain other medical fields. In other words, "it may appear that the scope of the witness's experience and education may embrace the subject in question in a general way, but the subject may be so specialized that even so, the witness will not be qualified to testify." *Dambacher v. Mallis*, 336 Pa.Super. 22, 485 A.2d 408, 419 (1984), *appeal dismissed*, 508 Pa. 643, 500 A.2d 428 (1985); *see also, Kovalev*, 2003 PA Super 432, ¶ 10, 839 A.2d 359 (doctor with general medical training was unqualified to testify about his orthopedic injuries); *Yacoub*, 805 A.2d at 592 (plaintiff failed to demonstrate that neurosurgeon was qualified to render expert opinion about standard of care appropriate to internal medicine or special unit care nursing); *Dierolf v. Slade*, 399 Pa.Super. 9, 581 A.2d 649, 651 (1990) (orthodontist lacked training and experience necessary to present expert

testimony regarding oral surgery); *McDaniel v. Merck, Sharp, & Dohme,* 367 Pa.Super. 600, 533 A.2d 436, 441–442 (1987) (expert in anesthetic drugs lacked training and experience to testify about whether continued use of an antibiotic drug caused death).

¶ 14 Such is the case here. We recognize that Dr. Lazar is a podiatrist who is certified by the American Board of Podiatric Surgery. As such, he is undoubtedly an expert in the general field of foot surgery. On the other hand, the trial court found that Dr. Lazar lacked the training and experience necessary to opine about the standard of care relevant to an **orthopedic surgeon** performing the particular procedure at issue. Specifically, the court noted that Dr. Lazar does not have an M.D., and therefore has not specialized in the field of orthopedic surgery. Trial Court Opinion, 8/13/2003, at 9, 12–14. By statute, the field of podiatric medicine is distinct from the field of general medicine that produces an M.D. *Id.* at 14–15. The training for podiatry is limited to the foot, while the training for general medicine includes the body as a whole. Similarly, the training for orthopedic surgery involves consideration of the entire skeletal system, rather than just the foot. *Id.* at 16. The trial court concluded:

> The scope of podiatry, in this case, did not rise to a legally competent comprehension of an orthopedic manner of pre-operatively thinking about and approaching the upcoming surgery or an orthopedic understanding of post-surgical care and treatment. Dr. Lazar provided no evidence that he was significantly familiar with an orthopedist's distinctive holistic modality of performing surgery or with an orthopedist's holistic post-surgical standards of care and treatment. Dr. Lazar never established that the norms by which he judged Dr. Hecht's surgery on and sub-

sequent treatment and care of [Appellant] were norms applicable to orthopedic surgeons.

*Id.* at 13–14.

¶ 15 We agree with the trial court. Dr. Lazar's report never makes reference to an orthopedic surgeon's standard of care. Because Dr. Lazar referred only to a "normal" standard of care, the trial court reasonably concluded that Dr. Lazar was referring to a podiatrist's standard of care, rather than an orthopedic surgeon's standard of care. Finally, and most importantly, Dr. Lazar did not indicate in his report that this unspecified "normal" standard of care was indeed universal. The trial court explained:

> This Court cannot assume that there is a universal standard of care observed by surgeons of every system or school of surgery. Dr. Lazar did not identify even minimally a standard of care common to all surgeons, podiatrists and orthopedists alike. Nor did he provide evidence of where a podiatric approach and an orthopedic approach would coincide, or why an orthopedic surgeon should adhere to the standards of care appropriate to the subspecialty of podiatric surgery.

*Id.* at 12.

¶ 16 Our review of the record reflects no abuse of discretion in the trial court's analysis. Appellant failed to demonstrate that Dr. Lazar's training and experience was sufficient for him to render a competent opinion regarding the applicable standard of care. Moreover, the report itself did not indicate that Dr. Lazar was familiar with the proper standard of care. Appellant's first claim lacks merit.

¶ 17 Our esteemed colleague, Judge Johnson, would hold that Dr. Lazar should be deemed competent to testify as an expert (subject to future disqualification) be-

cause the general subject matter of the procedure at issue was indisputably within his area of expertise. While the Dissent's position is vigorous and well-argued, we decline to adopt it for several reasons. First, as noted further *infra*, Dr. Lazar criticized far more than the way in which Dr. Hecht performed the bunion-removal surgery. Rather, Dr. Lazar criticized Dr. Hecht's entire follow-up program, including his use of a new type of absorbable internal fixation device. Thus, even assuming *arguendo* that there is indeed a single, universal standard of care for performing a bunion removal surgery (a proposition which Appellant failed to establish), the possibility is great that different specialists would have different standards of care relating to post-operative treatment.

¶ 18 Second, in our view, the relevant standard of care pertains not only to the procedure being performed, but also pertains closely to the qualifications of the person performing that procedure.[3] We can conceive of many reasons (*e.g.*, treatment philosophy, prior training, or expectations of the field), that a specialist in one area would hold himself or herself to a different standard of care from a specialist in another area, even as to the same procedure. In other words, one specialist's "normal" standard of care may be abnormally conservative, abnormally risky, or insufficiently proven to be effective in the eyes of another specialist. It may be true that two different fields of medicine share the same standard of care for a given procedure. Again, however, the person who renders such an opinion should be competent to do so, and should present such evidence with competent supporting facts. In our view, for the reasons set forth above, a generalized statement that a "normal" standard of care applies is insufficient to carry this burden.

¶ 19 Finally, even if we were to agree with the Dissent with respect to the common law standards for expert witnesses, for the reasons set forth *infra*, we would hold that Dr. Lazar was unqualified to render an opinion under the MCARE Act. We now turn to that issue.

¶ 20 Appellant argues that the trial court erred by finding that Dr. Lazar was unqualified as an expert under the MCARE Act, 40 P.S. § 1303.512 ("Expert Qualifications"). This issue is marked by a procedural irregularity. At the hearing on the motion *in limine*, the court expressly ruled that its decision was **not** based on the MCARE Act. The trial court then ruled that Dr. Lazar's testimony was inadmissible under the MCARE Act in its Rule 1925 opinion. *See*, footnote 2, *supra*.

¶ 21 Appellant argues in passing that § 1303.512 does not apply to this case because it was enacted after her complaint was filed. Appellant's Brief at 12. We disagree. Section 1303.512 indicates that it became effective 60 days from March 20, 2002 (*i.e.*, on or about May 20, 2002). Thus, § 1303.512 had been in effect for approximately seven months before the trial court excluded Dr. Lazar's testimony in December 2002.

¶ 22 Certain sections of the MCARE Act apply only to "causes of action which arise on or after the effective date" of those sections. *See, e.g.*, Historical and Statutory Note to § 1303.513 (Statute of Repose), Historical and Statutory Note to § 1303.516 (Ostensible Agency). No such caveat applies to Section 1303.512. Accordingly, we hold that this section does apply to Appellant's case.

---

**3.** Indeed, as noted further *infra*, the newly enacted MCARE Act reflects this concern in great detail.

¶ 23 The record reflects that the trial court did not allow the parties an opportunity to litigate the question of whether Dr. Lazar's testimony was admissible under the MCARE Act. Thus, we cannot fault Appellant for raising this issue for the first time on appeal. *See, DiGregorio v. Keystone Health Plan,* 2003 PA Super 509, ¶ 16, 840 A.2d 361 (*en banc* ).

¶ 24 At first blush, it would appear that a remand is necessary to determine whether Dr. Lazar's opinion.was admissible under the MCARE Act. Ultimately, however, we conclude that no remand is necessary. The Act provides:

**Section 1303.512. Expert qualifications**

**(a) General rule.**—No person shall be competent to offer an expert medical opinion in a medical professional liability action against a physician unless that person possesses sufficient education, training, knowledge and experience to provide credible, competent testimony **and fulfills the additional qualifications set forth in this section as applicable.**

**(b) Medical testimony.**—An expert testifying on a medical matter, including the standard of care, risks and alternatives, causation and the nature and extent of the injury, must meet the following qualifications:

(1) Possess an unrestricted physician's license to practice medicine in any state or the District of Columbia.

(2) Be engaged in or retired within the previous five years from active clinical practice or teaching.

Provided, however, the court may waive the requirements of this subsection for an expert on a matter other than the standard of care if the court determines that the expert is otherwise competent to testify about medical or scientific issues by virtue of education, training or experience.

**(c) Standard of care.**—In addition to the requirements set forth in subsections (a) and (b), an expert testifying as to a physician's standard of care also must meet the following qualifications:

(1) Be substantially familiar with the applicable standard of care for the specific care at issue as of the time of the alleged breach of the standard of care.

(2) Practice in the same subspecialty as the defendant physician or in a subspecialty which has a substantially similar standard of care for the specific care at issue, except as provided in subsection (d) or (e).

(3) In the event the defendant physician is certified by an approved board, be board certified by .the same or a similar approved board, except as provided in subsection (e).

**(d) Care outside specialty.**—A court may waive the same subspecialty requirement for an expert testifying on the standard of care for the diagnosis or treatment of a condition if the court determines that:

(1) the expert is trained in the diagnosis or treatment of the condition, as applicable; and

(2) the defendant physician provided care for that condition and such care was not within the physician's specialty or competence.

**(e) Otherwise adequate training, experience and knowledge.**—A court may waive the same specialty and board certification requirements for an expert testifying as to a standard of care if the court determines that the expert possesses sufficient training, experience and knowledge to provide the testimony as a result of active involvement in or full-time teaching of medicine in the applica-

ble subspecialty or a related field of medicine within the previous five-year time period.

40 P.S. § 1303.512 (emphasis added).

¶ 25 Subsection (a) provides that the expert must, first, have "sufficient education, training, knowledge and experience to provide credible, competent testimony" and second, fulfill the additional qualifications set out in § 1303.512. In our view, the first part of subsection (a) restates the common law standards for rendering an expert medical opinion. The Act then adds new requirements, in addition to the common law requirements, in subsections (b) through (d). While certain requirements of other subsections may be waiveable, the "baseline" common law requirements of subsection (a) are not waiveable. Thus, it logically follows that if the expert's opinion is inadmissible under the common law, it will not be admissible under the MCARE Act. As noted above, the court did not abuse its discretion by excluding Dr. Lazar's testimony under the common law. As such, the testimony would be inadmissible under the MCARE Act as well.

¶ 26 Even if Dr. Lazar's testimony meets the common law test set forth in subsection (a), we would hold that his testimony is inadmissible under subsection (b) of the MCARE Act. Subsection (b) provides that an expert who testifies as to any medical matter must possess "an unrestricted physician's license." By statute, podiatrists are not "physicians." *See*, 1 Pa.C.S.A. § 1991 (defining "physician" in relevant part as a person licensed "to engage in the practice of medicine and surgery in all its branches"); 63 P.S. 422.2 (defining "physician" as a "medical doctor" or "doctor of osteopathy"; further defining "medical doctor" as one who is licensed by

the State Board of Medicine); 63 P.S. § 42.1 *et seq.* (podiatrists are licensed by the State Board of Podiatry); 40 P.S. § 1303.103 (distinguishing between physicians and podiatrists in the definition of "health care provider"). The "physician's license" requirement **may** be waived, so long as the court determines that the expert "is otherwise competent to testify about medical or scientific issues by virtue of education, training or experience." 40 P.S. § 1303.512(b). It is clear from the record that the trial court chose not to waive this requirement, and would not have done so if we remanded the case. Moreover, we would see no abuse of discretion in the court's decision not to waive this requirement.

¶ 27 Our disposition makes it unnecessary to examine subsection (c) in detail. Nevertheless, we do note that when an expert testifies with respect to the standard of care for a procedure performed by a board-certified physician, the testifying expert must "be board certified by the same or a similar approved board." 40 P.S. § 1303.512(c)(3). Dr. Lazar is not board-certified in orthopedic surgery, nor is he certified by a "similar approved board." Again, this requirement **may** be waived, but we would see no abuse of discretion in the trial court's decision not to waive it in this case.

¶ 28 Finally, Appellant argues that the court abused its discretion by failing to allow Dr. Lazar to testify in person at the hearing.[4] In order to analyze this issue, it is necessary to summarize the motion *in limine* proceedings. The record reflects that at the beginning of the hearing, Judge Tereshko indicated his reasons for denying the motion *in limine*. Judge Tereshko reasoned, in part, as follows:

---

**4.** Appellant raised this issue in her Concise Statement under Pa.R.A.P. 1925, but the trial court did not address this issue in its Rule 1925 opinion.

[Dr. Lazar] would testify as to the standard of care in podiatric medicine, and the relevant issue in this case is the standard of care in orthopedic medicine. Although it's the same body part that was operated upon, the same body part that was operated upon is the same body part that each of the relative doctors would have their specialty, it's just literally two schools of medicine, that podiatric school of medicine versus an orthopedic school of medicine.

And in formal [sic] conversation with counsel yesterday, it was pointed out to me that each of the relative experts would be opining within their area of expertise, that is, podiatric medicine and orthopedic medicine, and would be relying upon learned treatises in those respective areas. And learned treatises approach the subject matter from a different point of view, and come to different conclusions about the standard of care within their respective areas of medicine.

N.T., 12/17/2002, at 3–4.

¶ 29 Appellant's counsel then urged the trial court to hear from Dr. Lazar personally. Appellant's counsel argued as follows. The critical question was whether Dr. Hecht's bunion-removal surgery sufficiently reduced the intermetatarsal angle in Appellant's foot. Dr. Lazar learned from Dr. Hecht's own testimony that the standard of care **in orthopedic surgery** is that the procedure should reduce the angle to between 9 and 11 degrees.[5] According to Dr. Hecht, the surgery successfully reduced the angle to nine degrees (and thus fell within the orthopedic standard of care). In contrast, Dr. Lazar examined

Appellant's post-operative X-rays and found that Dr. Hecht's surgery reduced the intermetatarsal angle to 14 degrees (and thus did not fall within the orthopedic standard of care). Finally, Dr. Hecht and Dr. Lazar each measure the intermetatarsal angle the same way. Thus, according to Appellant, Dr. Lazar should have been able to testify that according to his calculations, the surgery failed to comply with the orthopedic standard of care. N.T., 12/17/2002, at 5–7. Moreover, Appellant stated that Dr. Lazar was prepared to testify that in podiatry school, he learned the differences between the orthopedic standard of care and the podiatric standard of care in terms performing the surgery at issue. *Id.* at 12. The trial court declined to hear Dr. Lazar's testimony, on the ground that he remained unqualified to render an expert opinion.

¶ 30 While Appellant's position has some appeal, we conclude that the court did not abuse its discretion in declining to hear from Dr. Lazar personally. First, Dr. Lazar's familiarity with the orthopedic standard of care is largely based on repeating what Dr. Hecht has stated. The general rule is that experts may express opinions based in part on hearsay or otherwise-inadmissible evidence, but such evidence still must be the sort of evidence which is customarily relied upon by experts in the practice of their profession. *Yacoub,* 805 A.2d at 593. As a podiatrist, Dr. Lazar does not customarily rely on evidence of an orthopedic surgeon's standard of care. Thus, Dr. Lazar may not rely on his secondhand knowledge of the orthopedic standard of care. *Id.; Dierolf,* 581 A.2d at 650.[6]

5. Appellant's preoperative intermetatarsal angle was 18 or 19 degrees.

6. There is wisdom to the requirement that there be some linkage between the expert's field of study and his opinion about the relevant standard of care. Without such a link, an expert in any field could testify about the standard of care in **any** other given field, so long as the expert purports to learn that stan-

¶ 31 Next, Dr. Lazar's expert report criticizes far more than the alleged failure of Dr. Hecht's surgery to reduce the intermetatarsal angle. Specifically, Dr. Lazar's report states that Dr. Hecht: (1) neglected weeks of post-operative X-rays which would have revealed that the operation failed to fully correct the problem and indeed produced the new problem of "metatarsal elevatus"; (2) erred by using a new type of absorbable internal fixation device on an overweight patient; and (3) erred by allowing Appellant to put weight on her foot, when Appellant should have kept all weight off of the foot for at least 5–6 weeks. Dr. Lazar opined that all of these errors harmed Appellant and fell below the [unspecified] "normal standard of care." In other words, Dr. Lazar criticized Dr. Hecht's entire operative **and post-operative** treatment of Appellant. At the hearing, Appellant never offered to prove that Dr. Lazar had the training or expertise necessary to render a competent opinion as to the orthopedic standard of care in all of these areas. Thus, the trial court did not abuse its discretion by refusing to hear from Dr. Lazar at the hearing.[7] Appellant's final claim fails.

¶ 32 Order affirmed.

¶ 33 Judge JOHNSON files a Dissenting Opinion.

DISSENTING OPINION BY
JOHNSON, J.:

¶ 1 I respectfully dissent. In this case the Majority would affirm the trial court's entry of summary judgment against a medical malpractice plaintiff on the conclusion that the plaintiff's proffered expert witness, a *doctor of podiatric medicine*, was not qualified to testify as an expert against the defendant orthopedic surgeon. Regrettably, the Majority presumes, as did the trial court, that the standard of care for the removal of bunions is materially different in podiatric practice from the standard for the same procedure when conducted by an orthopedist. I am aware of no such presumption in our law. Nevertheless, the Majority accepts the trial court's explanation, requiring no substantiation for its determination that the standards are in fact distinct, and apparently adopts the trial judge's philosophical exegesis. Indeed, the Majority would compound the trial judge's error, concluding that the court did not err when it refused the only testimony offered to determine what, if any, overlap exists between the respective doctors' expertise and practice. In the absence of such evidence, we cannot properly conclude that the proffered expert witness was not qualified to testify against the defendant. I conclude accordingly that the trial court's entry of summary judgment in this matter was erroneous.

¶ 2 In Pennsylvania, the threshold of expertise necessary to qualify a witness to give expert testimony is relatively modest. *See Miller v. Brass Rail Tavern*, 541 Pa. 474, 664 A.2d 525, 528 (1995). The witness must have sufficient skill, knowledge, or expertise in the field at issue "as to make it appear that his opinion or inference will probably aid the trier [of fact] in his search for truth." *W. Phila. Therapy Ctr. v. Erie Ins. Group*, 751 A.2d 1166, 1168 (Pa.Super.2000). Accordingly, the witness needs neither to possess all of the knowledge in his field of expertise, *see Miller*,

---

dard through a literature search or through hearsay.

7. We stress that we do not condone the practice of relying solely on an expert's *curriculum vitae* when determining whether he or she is competent to testify. Rather, the better practice is for trial courts to take evidence directly from the expert before ruling on the issue.

664 A.2d at 528, nor to be the best witness to testify on the matter at hand, *see Chanthavong v. Tran,* 452 Pa.Super. 378, 682 A.2d 334, 339 (1996) (quoting *Taylor v. Spencer Hosp.,* 222 Pa.Super. 17, 292 A.2d 449, 453 n. 2 (1972)). Rather, he need only possess "more knowledge than is otherwise within the ordinary range of training, knowledge, intelligence or experience" of the average juror. *See Miller,* 664 A.2d at 528; *see also W. Phila. Therapy Ctr.,* 751 A.2d at 1168. Thus, regardless of the source or character of his expertise, a witness may testify as an expert if he has "**any** reasonable pretension to specialized knowledge on the subject under investigation." *Id.* (original emphasis). Provided this standard is met, the witness is qualified to testify and the weight accorded his or her testimony is left to the factfinder, which will accept or reject it on grounds of credibility. *See id.*

¶ 3 I agree with the Majority that even subject to this lenient benchmark, not all expert testimony is admissible on the point for which it is offered. An expert's opinion is admissible only to the extent that the witness's experience and education encompasses the subject in question.

> Sometimes it may appear that the scope of the witness's experience and education embraces the subject in question in a logical, or fundamental, sense. In such a case, the witness is qualified to testify even though he has no particularized knowledge of the subject as such; for he will be able to reason from the knowledge he does have.

> \* \* \* \*

> Other times it may appear that the scope of the witness's experience and education may embrace the subject in question in a general way, but the subject may be so specialized that even so, the witness will not be qualified to testi-

fy. Thus, every doctor has a general knowledge of the human body. But an ophthalmologist, for example, is not qualified to testify concerning the causes and treatment of heart disease.

*Dambacher v. Mallis,* 336 Pa.Super. 22, 485 A.2d 408, 419 (1984). Significantly, however, neither *Dambacher* nor any other case espouses a rule of law that shields practitioners in one practice specialty from the opinions of those in others based merely on differing credentials or certifications. *Compare* Op. at 99 (concluding that "the relevant standard of care is the standard applicable to orthopedic surgeons, because the procedure at issue was performed by an orthopedic surgeon").

¶ 4 Rather, our cases recognize consistently that, particularly in medicine, the overlap of practitioners' education and experience in treating the same or similar maladies renders the opinions of one specialist instructive on how properly to treat those maladies, regardless of the practitioners' respective credentials. Thus, even in cases of medical malpractice, which depend for resolution on identifying and applying an appropriate standard of care, we have been circumspect in limiting the admissibility of expert testimony so long as the witness's clinical experience encompasses the treatment, practice, or malady at issue. *See B.K. v. Chambersburg Hosp.,* 834 A.2d 1178, 1182 (Pa.Super.2003) (reversing grant of summary judgment against plaintiff and allowing pediatrician to testify as expert witness against emergency room physician on claim of malpractice for emergency room care of pediatric seizure); *George v. Ellis,* 820 A.2d 815, 818–19 (Pa.Super.2003) (granting new trial in action against board-certified orthopedist where plaintiff's expert witness, a physician not licensed in the United States, had nonetheless conducted hundreds of surgeries of the type at issue); *Corrado v.*

*Thos. Jefferson Univ. Hosp.,* 790 A.2d 1022, 1028 (Pa.Super.2001) (affirming trial court's ruling allowing testimony of physician not certified in radiology to testify on reading CT films and radiologist's standard of care where physician, an internist and medical oncologist, practiced multi-disciplinary approach to treatment of cancer patients); *Rauch v. Mike–Mayer,* 783 A.2d 815, 821–22 (Pa.Super.2001) (reversing grant of summary judgment against plaintiff estate of stroke victim on basis that plaintiff's proffered expert witnesses in neurology, emergency medicine, and internal medicine possessed adequate knowledge of cause of stroke to testify concerning causative role of anesthesiologist); *Bindschusz v. Phillips,* 771 A.2d 803, 807–09 (Pa.Super.2001) (affirming trial court's ruling allowing testimony of anesthesiologist on causes of neurologic pain disorder sustained by patient during surgery by defendant orthopedic surgeon); *Poleri v. Salkind,* 453 Pa.Super. 159, 683 A.2d 649, 655 (1996) (vacating and remanding for new trial where trial court precluded testimony of physiatrist on appropriate standard of care for post-operative wound care by orthopedic surgeon).

¶ 5 Indeed, we have sustained trial courts' refusals to admit expert medical testimony only where the record demonstrated that the proffered witness had *no* expertise or experience in the treatment, procedure or practice about which he sought to testify. *See Kovalev v. Sowell,* 839 A.2d 359, 364 (Pa.Super.2003) (affirming grant of compulsory non-suit against plaintiff who offered expert testimony on his own behalf concerning purported spinal injury because although plaintiff had formerly practiced medicine in Russia, "he had *no specialized skills, knowledge or experience* in orthopedics, radiology, neurology, or any medical subspecialty that would have been pertinent to this case"); *Yacoub v. Lehigh Valley Med. Assocs.,* 805 A.2d 579, 592 (Pa.Super.2002) (affirming ruling at trial precluding testimony by neurologist against internist and nursing staff where witness "*could not remember* the last time he interacted with nurses in a Special Care Unit, ... *never published anything regarding nursing,* ... *never practiced* or became certified in internal medicine and [ ] *did not regularly read journals* on this topic"); *Dierolf v. Slade,* 399 Pa.Super. 9, 581 A.2d 649, 651 (1990) (affirming trial court's ruling precluding testimony of orthodontist concerning cause of plaintiff's nerve injury during oral surgery where witness "*never performed surgery, never observed a peroneal nerve injury, is not a neurologist, is not board certified and is rarely present in the operating room* ").

¶ 6 This approach is entirely consistent with our jurisprudence outside the medical malpractice arena. *See e.g. Erschen v. Pa. Indep. Oil Co.,* 259 Pa.Super. 474, 393 A.2d 924 (1978) (finding fire marshal not qualified to testify on origin of gas explosion because he had *no formal instruction or on-the-job training* concerning that issue); *McDaniel v. Merck, Sharp & Dohme,* 367 Pa.Super. 600, 533 A.2d 436, 441–42 (1987) (finding specialist in pharmacology not qualified to testify concerning drug he had *never studied or researched and with which he had no clinical experience* ); *Dambacher v. Mallis,* 336 Pa.Super. 22, 485 A.2d 408 (1984) (finding two auto mechanics not qualified to testify concerning effect of mixing radial and non-radial tires because "*nothing in their experience, or in such education as they had had,* enabled them to reason about what that effect would be").

¶ 7 In no case have we determined evidentiary admissibility based merely on purported distinctions in treatment philosophy where the proffered expert's clinical experience encompasses the procedure or

treatment at issue. Similarly, we have eschewed attempts to limit admissibility based merely on formalized distinctions between areas of specialization or practice. *See Rauch v. Mike–Mayer*, 783 A.2d at 821–22 ("We are unaware of any reason that would preclude the cause of stroke from being matter within the cognizance of any medical doctor."); *cf. B.K.*, 834 A.2d at 1182 ("The touchstone of expert qualification is, again, 'specialized knowledge.' To preclude scholars, authors, instructors, and other authorities from qualifying as experts simply because they teach or supervise a craft rather than practice the craft flies in the face of the specialized knowledge standard.").

¶ 8 I am compelled to conclude accordingly that neither orthopedic surgeons nor practitioners of any other medical specialty may be insulated from the comment or criticism of peers in other specialties on the basis of "holistic treatment philosophy" or any similarly amorphous criterion. In this case, the trial court espoused a rule wholly to the contrary, and in so doing, flouted a long and varied line of appellate cases, all germane to this issue. Moreover, the court pursued its course without any substantiation of record to show that the distinctions it cited between specialists do in fact exist or that they are in any way material to a podiatrist's ability to testify on the appropriate standard of care for the treatment of bunions by an orthopedic surgeon. Indeed, the court's rationale appears crafted from inference on inference with reference only to dictionary definitions and legal treatises, both secondary sources of authority. *See* Trial Court Opinion, 8/13/03. at 12 nn. 2, 3 (quoting DORLAND'S MEDICAL DICTIONARY 1193 (28th ed.1994)); 70 C.J.S. PHYSICIANS, SURGEONS AND OTHER HEALTH CARE PROVIDERS § 5. The following excerpt, which the Majority appears to accept, Op. at 100, is illustrative if not uncommon:

As treatment of a part within the context of the whole is to treatment of one of its decontextualized parts, so is an orthopedic approach to surgery of the foot to a podiatric approach to the same surgery. Medical surgery is a specialty within medicine and orthopedics, which [the defendant] specialized in, is a subspecialty within medical surgery. Specifically, orthopedics is defined as that branch which is specifically concerned with the preservation and restoration of the function of the skeletal system, its articulations and associated structure." [footnote omitted, citing DORLAND'S MEDICAL DICTIONARY] *Thus, the approach an orthopedic surgeon will take to a patient will be guided by his understanding of the patient's entire skeletal system, including the skeletal system's articulations and associated structures, viewing the foot as one part of the entire system.*

By contrast, podiatry, which [plaintiff's expert] specialized in, is defined as "the care of the foot, including its anatomy, pathology, medical and surgical treatment, etc." [footnote omitted, citing DORLAND'S MEDICAL DICTIONARY] *Hence the approach a podiatric surgeon will take to a patient will be guided by his telescoped focus on the patient's foot, that one part of the patient's overall skeletal system that the podiatrist is specifically trained to study and care for. By way of contrast between the different modalities of treatment, the holistic approach an orthopedic surgeon takes may at times, for example, involve considering amputations, which the restricted approach a podiatrist takes may never consider, nor may a podiatrist consider administering anesthetics that often form part of an orthopedist's holistic approach.*

Trial Court Opinion, 8/3/03, at 12–13 (emphasis added). Similar excerpts appear

elsewhere in the court's opinion and, like this one, are not substantiated. Trial Court Opinion, 8/3/03, at 14–15.

¶ 9 The court's inferential conclusions, which appear in italics above, are the linchpin of its analysis; from them the court divines that the standard of care for orthopedists is distinct from that of podiatrists, notwithstanding the fact that the procedure in question (the treatment of bunions) is indisputably common to both specialties and, at least ostensibly, will not require amputation. Trial Court Opinion, 8/3/03, at 12–13. The court then attributes multiple perceived deficiencies in the podiatrist's expert report to a failure to dispel the distinctions the court presumes in the foregoing paragraphs. Trial Court Opinion, 8/3/03, at 11–12. I find the court's inferences unsubstantiated and therefore cannot countenance its decision to preclude the plaintiffs' expert testimony, putting them out of court on what I can only characterize as conjecture.

¶ 10 Under similar circumstances, where the proffered expert's practice bears common elements with the defendant's, we have admitted the expert's testimony subject to proof that he or she is not qualified to testify, *i.e.* that the "expert" in fact has no expertise on the subject in question. *See Rauch,* 783 A.2d at 822 (reversing trial court's order granting summary judgment in favor of defendant anesthesiologist because "no matter of record indicates that [plaintiff's expert witnesses] were unqualified to express an expert medical opinion concerning the standards pertinent to the treatment of a patient in Mrs. Rauch's condition at the time of her demise"). Because I find no demonstration on the record that the podiatrist whose testimony is at issue lacked expertise in the treatment of bunions (operatively, post-operatively, or at any other time), I am compelled to conclude that the trial court erred in pre-cluding his testimony. Accordingly, the court's entry of summary judgment is likewise erroneous.

¶ 11 Moreover, I am unconvinced at the applicability to this action of the Medical Care Availability and Reduction of Error Act (MCARE), on provisions of which the Majority relies in the alternative to affirm the trial court's order. As the Majority has acknowledged, the trial court expressly negated reliance on MCARE in its order granting the defendant's motion *in limine* but then acknowledged the statute in its Rule 1925(a) opinion. Although I recognize that we may affirm a trial court's disposition on any basis apparent in the record, *see Bearoff v. Bearoff Bros., Inc.,* 458 Pa. 494, 327 A.2d 72, 76 (1974), I am troubled that the Majority's embrace of MCARE at this late juncture has effectively deprived the parties of any opportunity to develop a record responsive to MCARE's provisions. Perhaps if the defendants had sought to apply MCARE before the trial judge, the plaintiff could have acted to obtain additional expert testimony that the trial judge, and ostensibly the Majority, would have found more palatable.

¶ 12 More to the point, however, I simply find no authority for the Majority's retroactive application of a statute that effectively recasts the standard by which the plaintiffs must prove their entitlement to relief on a vested cause of action. The plaintiff, in her appellate brief, contested the trial court's belated application of MCARE, contending that the statute was enacted after the commencement of this case. In my view, this point is potentially dispositive. The Majority, however, dismisses the plaintiff's assertion in the following excerpt:

> Appellant argues in passing that § 1303.512 does not apply to this case because it was enacted after her com-

plaint was filed. Appellant's Brief at 12. We disagree. Section 1303.512 indicates that it became effective 60 days from March 20, 2002 (i.e., on or about May 20, 2002). Thus, § 1303.512 had been in effect for approximately seven months before the trial court excluded Dr. Lazar's testimony in December 2002.

Certain sections of the MCARE Act apply only to "causes of action which arise on or after the effective date" of those sections. *See, e.g.,* Historical and Statutory Note to § 1303.513 (Statute of Repose), Historical and Statutory Note to § 1303.516 (Ostensible Agency). No such caveat applies to Section 1303.512. Accordingly, we hold that this section does apply to Appellant's case.

Op. at 101. Significantly, the Majority's disposition relies not upon any directive from the legislature, but upon the absence of one. The Majority apparently reasons that because section 512 specifies an effective date and does not direct that its strictures should be applied only prospectively, it may be applied to all cases regardless of the dates on which the underlying cause of action arose. I find no support for so encompassing an application of this section. Given the attendant eradication of the plaintiff's substantive claim, I find it contrary to law.

¶ 13 The Statutory Construction Act proscribes retroactive application of statutes save for those exceptional instances where the legislature so directs. The mandate of the Act is clear that "[n]o statute shall be construed to be retroactive unless clearly and manifestly so intended by the General Assembly." 1 Pa.C.S. § 1926 (**Presumption against retroactive effect**). In accordance with this proscription, our Supreme Court has refused to apply enactments retroactively unless the legislature appends specific direction that the section in question is to be so applied.

*See Petrovick v. Commonwealth, Dep't of Transp.,* 559 Pa. 614, 741 A.2d 1264, 1269 (1999) (superseded by statute on other grounds, 75 Pa.C.S. § 1586) (declining to apply statutory amendment to action in process prior to its enactment because amendment did not require such application in express terms); *see also Moyer v. Berks Cty. Bd. of Assessment,* 803 A.2d 833, 842 (Pa.Cmwlth.2002) ("It is well established that a statute must be construed prospectively unless the legislature intends that it operate retrospectively and expresses this intent so clearly as to preclude any question."). I find no such direction appended to MCARE section 512, nor can I construct the requisite level of clarity from the legislature's application of MCARE section 512 sixty days after the date of enactment. The caveats appended to other sections of the Act do not ameliorate my doubt; the fact remains that both the Statutory Construction Act and our Supreme Court's holdings require manifest certainty, not an assumption constructed from the absence of direction that is only made apparent by reference to provisions not at issue.

¶ 14 I am mindful nevertheless that application of a statute to a pending action cannot be deemed retroactive merely because some of the facts or conditions upon which its application depends came into existence prior to its enactment. *See In re R.T.,* 778 A.2d 670, 679 (Pa.Super.2001) (citing *Creighan v. City of Pittsburgh,* 389 Pa. 569, 132 A.2d 867, 871 (1957)). Indeed, our Supreme Court has acknowledged that "legislation concerning purely procedural matters will be applied not only to litigation commenced after its passage, but also to litigation existing at the time of passage." *Morabito's Auto Sales v. Commonwealth, Dep't of Transp.,* 552 Pa. 291, 715 A.2d 384, 386 (1998). Conversely, legislation affecting substantive rights may not be so applied. *See id.*

¶ 15 Because the nature of the rights affected is dispositive, it must mark the beginning of our inquiry. The demarcation between laws bearing on substantive rights and those that are "purely procedural" is notoriously vexing and has fostered disagreement amongst generations of jurists. *See Laudenberger v. Port Authority*, 496 Pa. 52, 436 A.2d 147, 150 (1981) ("The attempt to devise a universal principle for determining whether a rule is inherently procedural or substantive in nature has met with little success in the history of our jurisprudence."). " '(I)n many situations procedure and substance are so interwoven that rational separation becomes well-nigh impossible.' " *Laudenberger*, 436 A.2d at 150 (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 559, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949) (Rutledge, J., dissenting)). Accordingly, our Supreme Court has been circumspect in adopting static analytical definitions, recognizing that they "would only be useful if 'substance' and 'procedure' were two 'mutually exclusive categories with easily ascertainable contents.' " *Laudenberger*, 436 A.2d at 150 (quoting *Sibbach v. Wilson & Co.*, 312 U.S. 1, 17, 61 S.Ct. 422, 85 L.Ed. 479 (1941) (dissenting opinion of Frankfurter, J., in which Black, Douglas, and Murphy, JJ., concurred)). In attempting to "unravel this Gordian knot," *Laudenberger*, 436 A.2d at 150, the Court has cautioned against simplistic solutions:

> The tacit assumption that the precise point at which the line between the two is to be drawn is the same for all purposes . . . is of course connected with the other assumptions . . . namely, that the 'line' is to be 'discovered' rather than 'drawn' and that it can be located without keeping in mind the purpose of the classification. If once we recognize that the 'line' can be drawn only in the light of the purpose in view, it cannot be assumed without discussion that as our purposes change the line can be drawn at precisely the same point."

*Laudenberger*, 436 A.2d at 150 (quoting W. Cook, Logical and Legal Bases of the Conflict of Law 158–159 (1942)).

¶ 16 I need not resolve the quandary this issue poses. Even as our jurisprudence on the point is murky, the Supreme Court's language limiting retroactive application is patently clear. *See* 715 A.2d at 386. Litigation pending on the date new legislation is enacted is subject thereto if the legislation is *"purely procedural." Id.* The Court's choice of words is careful and considered, its direction insistent that only those laws without substantive aspect may be accorded retroactive application in the absence of contrary *direction* by the legislature. I am compelled to conclude accordingly that any doubt concerning the character and affect of legislation must be resolved against the extended reach of retroactivity in favor of prospective application *only.* Thus, should questions remain concerning a statute's place in this dichotomy (or at the procedural end of a continuum), we are empowered to apply the statute only to litigation arising from causes of action that accrue after the statute's effective date.

¶ 17 Because I find the effect of section 512 on plaintiff's substantive rights pronounced, I cannot find it "purely procedural" and therefore view its application as doubtful. Almost by definition, this section works a seismic shift in the evidentiary landscape of medical malpractice cases and, in this case, has undermined the plaintiff's ability even to present her case for the putative violation of a vested right. *See Stroback v. Camaioni*, 449 Pa.Super. 395, 674 A.2d 257, 261 (1996) (quoting *Gibson v. Commonwealth*, 490 Pa. 156, 415 A.2d 80, 83 (1980)) ("There is a vested right in an accrued cause of action.").

Thus, although the circumscription of expert testimony that section 512 mandates might be described as procedural by some, *i.e.,* addressing methods by which rights are enforced, *see Morabito's Auto Sales,* 715 A.2d at 384, I cannot join in so sanguine an approach. "Procedural law is undeniably an integral thread in the fabric of the law. As threads are woven into cloth, so does procedural law interplay with substantive law." *Laudenberger,* 436 A.2d at 150. In my view, it is this symbiosis that our Supreme Court contemplated in limiting retroactive application to measures *"purely* procedural" in nature.

¶ 18 Because Section 512 effectively "raises the bar" on the character of proof required of a plaintiff to vindicate a substantive right, I cannot find it procedural, "purely" or otherwise. *See Jaquay v. Workers' Comp. Appeal Bd.,* 717 A.2d 1075, 1077 (Pa.Cmwlth.1998) (determining that "procedural statutes establish the method for enforcing a right, but have no bearing on whether a claimant has a legal entitlement to relief under the facts as they exist in a particular case"). Accordingly, I cannot conclude that section 512 is applicable to this or any other claim pending on the date of its enactment. Hence, it does not properly control this disposition.

¶ 19 In view of the foregoing, I would reverse the trial judge's decision and remand this matter for trial without prejudice to the defendant to seek disqualification of the plaintiff's expert at trial should the record substantiate his lack of expertise in the matters at issue. Because the Majority declines this course, I am compelled to dissent.