J-A03009-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| SKYAMBER SNODY, INDIVIDUALLY AND AS ADMINISTRATRIX OF THE ESTATE OF KARL R. SNODY, DECEASED | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : : : | |
| v. | : : : | No. 1153 MDA 2019 |
| ROBERT A. ETTLINGER, M.D., PINNACLE HEALTH SYSTEM, PINNACLE HEALTH MEDICAL GROUP D/B/A PINNACLE HEALTH FAMILY CARE MILLERSBURG | : : : : : | |

Appeal from the Judgment Entered July 12, 2019
In the Court of Common Pleas of Dauphin County Civil Division at No(s):
2016-CV-9362-MM

BEFORE:  LAZARUS, J., STABILE, J., and DUBOW, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED APRIL 21, 2020**

SkyAmber Snody ("Snody"), individually and as administratrix of the estate of Karl R. Snody, Deceased ("Decedent"), appeals from the judgment, entered in the Court of Common Pleas of Dauphin County, following a jury verdict in favor of Appellees.  Upon careful review, we affirm.

The trial court summarized the factual background of this case as follows:

> [Snody alleged] that Dr. [Robert A.] Ettlinger, a [f]amily [p]ractitioner, negligently prescribed [Decedent] excessive amounts of opioids and benzodiazepines over a five-year period which caused his death.  In his opening statement, [Snody's] counsel described how [Decedent] became a new patient of Dr.

Ettlinger's in 2009. [Decedent] was suffering from anxiety and was prescribed an antidepressant and anti-anxiety medication. Four days later, [Decedent] saw Dr. Ettlinger for a burn on his leg caused by a motorcycle pipe and was prescribed opioids for the pain. [Snody] argued that over the following five years, Dr. Ettlinger continued to over-prescribe opioids in combination with benzodiazepines[,] which ultimately caused [Decedent's] death in 2014.

It was Defendant[s'] position that [Decedent] suffered from chronic pain after falling from a tree stand in 2002. According to his daughter, as a result of the fall, he injured his knee and shoulder and thereafter, suffered from chronic pain. According to the defense, no one was absolutely certain of the cause of [Decedent's] death. There was no evidence that proved he died from an opioid overdose. However, a piece of a pen with white residue in it was discovered on [Decedent's] person at the scene. The residue was tested by the coroner's office and it tested positive for methamphetamine, not a drug that was prescribed by Dr. Ettlinger. The defense theorized that [Decedent] was smoking crystal meth and the likely scenario was that once the stimulant effect of the methamphetamine wore off, he "crashed" and fell asleep in his freezing cold trailer. When the paramedics reached [Decedent], his core body temperature was 60 degrees[,] which is not compatible with life.

Trial Court Opinion, 9/9/19, at 3-4.

On December 19, 2016, Snody filed a medical professional liability wrongful death and survival action against Appellees, Dr. Ettlinger and his employer, Pinnacle Health System, Pinnacle Health Medical Group, d/b/a Pinnacle Health Family Care Millersburg ("Pinnacle"). Snody alleged, *inter alia*, that Dr. Ettlinger: prescribed excessive and dangerous doses of opioids; failed to properly monitor and document the medications prescribed; failed to recognize the cumulative effects of opioids; prescribed medications that had known interactions; failed to record appropriate histories of Decedent's pain and its progression; failed to refer Decedent to an appropriate specialist; failed

to adequately evaluate or seek psychiatric evaluation for Decedent's anxiety and depression; and failed to recognize that the drugs prescribed could potentially cause death. *See* Complaint, 12/19/16, at ¶ 33(a)-(j). Snody's complaint also included a claim for punitive damages.

Appellees filed preliminary objections in which they sought to strike as impertinent paragraph 31 of Snody's complaint, which alleged that the federal government had investigated Dr. Ettlinger's prescribing practices, as well as Snody's claim for punitive damages. The court sustained the preliminary objections, without prejudice.

Following the close of pleadings and discovery and the disposition of numerous motions *in limine*, a five-day jury trial commenced on January 14, 2019. On January 18, 2019, the jury found Dr. Ettlinger not negligent as to all claims. Following briefing and oral argument, the trial court denied Snody's post-trial motions. Snody filed a timely notice of appeal,[1] followed by a court-ordered concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). She raises the following claims for our review:

> 1. Did the trial court commit prejudicial error by permitting, over [Snody's] counsel's objections with virtually every witness, defense counsel's reference to the deposition testimony of Decedent's daughter and her mother that defendant Ettlinger's

---

[1] Snody purports to appeal from the July 1, 2019 order denying post-trial motions. However, an appeal properly lies from the entry of judgment. ***Johnston the Florist, Inc. v. TEDCO Const. Corp.***, 657 A.2d 511, 514 (Pa. Super. 1995). Here, the jury verdict was reduced to judgment on July 12, 2019, and Snody filed a timely notice of appeal on July 15, 2019. We have amended the caption accordingly.

prescription of opioids was necessary to treat Decedent's excruciating pain from his 2002 fall from a deer tree stand?

2. Did the trial court commit prejudicial error in denying [Snody's] motion *in limine* by permitting Jason Brajer, M.D., an anesthesiologist, to testify as to the family practice standard of care of defendant Ettlinger, a practitioner in family medicine; that defendant Ettlinger did not violate the 11 allegations (a-j) of the complaint; and to testify beyond the scope of his report(s)?

3. Did the trial court commit prejudicial error in denying [Snody's] motion *in limine* by precluding the impeachment of Dr. Brajer for being sanctioned for the same opioid over[-]prescription practice as defendant Ettlinger?

4. Did the trial court commit prejudicial error in denying [Snody's] motion *in limine* by precluding impeachment and admission testimony that defendant Ettlinger had been investigated by the [Food and Drug Administration], the circumstances of the investigation, and Dr. Ettlinger paying a $45,000 fine?

5. Did the trial court commit prejudicial error in granting Defendants' motion *in limine* by precluding testimony as to the opioid crisis, including reference to literature of the skyrocketing increase in opioid deaths from 1997 to 2012?

6. Did the trial court commit prejudicial error in allowing an illegal drug defense which was unsupported by the evidence?

7. Did the trial court commit prejudicial error in granting Defendants' motion *in limine* by precluding [Snody's] toxicologist, William Sawyer, from testifying as to the standard of care of a physician in prescribing opioids?

8. Did the trial court commit prejudicial error in permitting, over [Snody's] objections, a statement in the hospital records that an unidentified family member said that Decedent had a history of snorting Xanax and other drugs?

9. Did the trial court commit prejudicial error in permitting defendant Ettlinger and his experts to defend the case on the basis that everyone at that time was prescribing opioids, as those

prescribed by Ettlinger, and criticizing the FDA for the opioid epidemic?[2]

10. Was the defense verdict contrary to the facts in the case and law when it is undisputed that Decedent was taking no opioid drugs when he commenced treatment with defendant Ettlinger, was prescribed opioids for a motorcycle burn that would be expected to heal in ten days, and continued a treatment regimen of prescribing thousands of opioid and benzodiazepine pills, for five and a half years?

11. Did the trial court commit prejudicial error in communicating with the jury outside of the courtroom, in the deliberations room, and communicating that the jury, at approximately 5:00 p.m. on Friday, wanted to stay as long as it took to reach a verdict, and a defense verdict was reached in less than an hour?

Brief of Appellant, at 8-10 (capitalization and punctuation adjusted).

Snody's first several claims involve the trial court's rulings on motions

*in limine*. Our standard of review for evidentiary rulings is a narrow one:

When we review a trial court's ruling on admission of evidence, we must acknowledge that decisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law. In addition, for a ruling on evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party.

*Lykes v. Yates*, 77 A.3d 27, 32 (Pa. Super. 2013), quoting *Reott v. Asia Trend, Inc.*, 7 A.3d 830, 839 (Pa. Super. 2010).

Snody first alleges that the trial court committed prejudicial error by allowing defense counsel to elicit from Snody and her mother, Andrea Koch, testimony regarding Decedent's excruciating pain resulting from a 2002 fall

---

[2] Although this claim is included in Snody's statement of questions involved, it is not addressed in the argument portion of her brief. We, therefore, consider the claim abandoned and will not address it. *Harkins v. Calumet Realty Co.*, 614 A.2d 699, 703 (Pa. Super. 1992).

- 5 -

from a tree stand. She further claims that the court allowed Koch and unidentified others to testify as to the contents of Decedent's medical records, "including snorting Xanax and taking crystal meth." Brief of Appellant, at 27. By doing so, Snody alleges that the court permitted defense counsel to obtain speculative medical opinion testimony from non-expert fact witnesses.

Appellees argue that Snody has "failed to include a single citation to identify one example of these allegedly erroneous" rulings and urges us to find this claim waived. Brief of Appellees, at 10. Moreover, Appellees assert, the trial court "simply did [not] permit non-expert fact witnesses to provide opinion testimony." *Id.* at 11.

We agree with Appellees that Snody fails to identify any specific testimony supporting her claim that the trial court allowed inappropriate medical opinion testimony from either Snody or her mother. Rather, Snody peppers her argument with parenthetical references to broad swaths of the reproduced record, apparently expecting this Court to scour the portions of the record referenced, discern the exchanges complained of, and develop an argument on her behalf. However, it is the appellant's responsibility to precisely identify any purported errors. *In re Child M.*, 681 A.2d 793, 799 (Pa. Super. 1996) (Superior Court will not scour record on appellant's behalf trying to find mistakes by trial court). It is not the duty of the Superior Court to act as the appellant's counsel, and we decline to do so here. *See Andaloro v. Armstrong World Industries, Inc.*, 799 A.2d 71, 87 (Pa. Super. 2002).

Because Snody has failed to identify with any particularity the specific testimony to which she objects, we deem this claim waived.

Snody's next claim includes multiple sub-issues, all of which concern the testimony of Jason Brajer, M.D., a defense witness and board-certified physician in both anesthesiology and pain management. First, Snody asserts that the trial court erred by permitting Dr. Brajer to offer opinion testimony as to the family practice standard of care because he is not a family care practitioner. Snody argues that, under the Medical Care Availability and Reduction of Error Act ("MCARE Act"),[3] a physician may only provide expert testimony regarding a standard of care where he "practice[s] in the same subspecialty as the defendant physician or in a subspecialty which has a substantially similar standard of care for the specific care at issue." Brief of Appellant, at 29-30, quoting **Wexler v. Hecht**, 847 A.2d 95 (Pa. Super. 2004), and citing 40 P.S. § 1303.512. Snody argues that, because Dr. Ettlinger is a family practitioner and Dr. Brajer is not, Dr. Brajer was not qualified under the MCARE Act to render an opinion as to the standard of care in this case. This claim ignores the plain language of the MCARE Act and is utterly devoid of merit.

With respect to expert medical opinion testimony, the MCARE Act provides, in relevant part, as follows:

> (a) General rule.—No person shall be competent to offer an expert medical opinion in a medical professional liability action against a

---

[3] **See** 40 P.S. §§ 1303.101-1303.910.

physician unless that person possesses sufficient education, training, knowledge and experience to provide credible, competent testimony and fulfills the additional qualifications set forth in this section as applicable.

. . .

(c) Standard of care.—In addition to the requirements set forth in subsections (a) and (b) [relating to licensure and active practice or teaching requirements], an expert testifying as to a physician's standard of care also must meet the following qualifications:

(1) Be substantially familiar with the applicable standard of care **for the specific care at issue** as of the time of the alleged breach of the standard of care.

(2) Practice in the same subspecialty as the defendant physician **or in a subspecialty which has a substantially similar standard of care for the specific care at issue**.

. . .

(e) Otherwise adequate training, experience and knowledge.—A court may waive the same specialty and board certification requirements for an expert testifying as to a standard of care if the court determines that the expert possesses sufficient training, experience and knowledge to provide the testimony as a result of active involvement in or full-time teaching of medicine in the applicable subspecialty **or a related field of medicine** within the previous five years.

40 P.S. § 1303.512 (emphasis added).

Our Supreme Court has explained:

the 'relatedness' of one field of medicine to another, under subsection 512(e), can only be assessed with regard to **the specific care at issue**. Two fields of medicine may be 'related' with respect to certain specific issues of care, but unrelated with respect to other specific issues of care. Determining whether one field of medicine is 'related' to another with respect to a specific issue of care is likely to require a supporting evidentiary record and questioning of the proffered expert during *voir dire*.

***Vicari v. Spiegel***, 989 A.2d 1277, 1284 (Pa. 2009).

Here, the "specific care at issue" was Dr. Ettlinger's prescription and management of the Decedent's pain medications.[4] During *voir dire*, Dr. Brajer testified that he was board-certified in the subspecialty of pain management and has practiced office-based pain management for 10 years. N.T. Trial 1/17/19, at 814. He testified that his practice included treatment of pain through various injections, as well as the prescription of narcotics and other things. ***See id.*** In addition, he stated that his practice includes the treatment of patients suffering from depression and anxiety. ***See id.*** Doctor Brajer testified that there was a "dramatic overlap in how [he] would prescribe narcotics for patients in chronic pain and how a family physician does." ***Id.*** at 820.

_____

[4] During *voir dire* on Dr. Brajer's qualifications, the following exchange occurred between the trial court and plaintiff's counsel:

> THE COURT: [W]e heard testimony before about the broad scope of a family practitioner's practice. I believe it was from womb to tomb, cradle to grave, however you describe it. We're not talking about Dr. Ettlinger delivering a baby. We're talking about pain management and his prescription of medications to manage pain. Is that not the case?
>
> ATTORNEY ANGINO: What we are testifying—
>
> THE COURT: Is that not the case?
>
> ATTORNEY ANGINO: Yes.

N.T. Trial, 1/17/19, at 822.

Based on the foregoing, it is abundantly clear that Dr. Brajer was well-qualified to provide an opinion as to the standard of care related to the prescription and management of pain-management medicine pursuant to section 512 of the MCARE Act. Snody is entitled to no relief.

Snody also claims that the trial court erred in allowing Dr. Brajer to testify outside the scope of his expert report, in violation of Pa.R.C.P. 4003.5.[5] Specifically, Snody asserts that Dr. Brajer's report provided no basis for his conclusion that Dr. Ettlinger did not deviate from the standard of care, yet he testified as to "everything but what was in his report, including standard of care." Brief of Appellant, at 33. Likewise, Snody asserts that Dr. Brajer's report provided no basis for his conclusion that Dr. Ettlinger was not responsible for Decedent's death, yet he was permitted to provide causation testimony at trial. *See id.* at 34. Finally, Snody asserts that Dr. Brajer was

---

[5] Although Snody does not specify in her brief which portion of Rule 4003.5 she believes Dr. Brajer's testimony violated, it appears she is referring to the following subsection:

(c) To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings under subdivision (a)(1) or (2) of this rule, the direct testimony of the expert at the trial may not be inconsistent with or go beyond the fair scope of his or her testimony in the discovery proceedings as set forth in the deposition, answer to an interrogatory, separate report, or supplement thereto. However, the expert shall not be prevented from testifying as to facts or opinions on matters on which the expert has not been interrogated in the discovery proceedings.

Pa.R.C.P. No. 4003.5(c).

- 10 -

permitted to opine at trial that the government, rather than physicians, was responsible for the opioid epidemic, despite the absence of this "novel theory" from his report. *Id.* Appellees assert that these claims are "baseless," undeveloped, waived, and frivolous. *See* Brief of Appellees, at 16-18.

Once again, we note that Snody's arguments regarding Dr. Brajer's testimony are woefully underdeveloped and unsupported by specific references to the record and relevant law. For those reasons, we would be justified in finding these claims waived. Although we decline to do so, we agree with the Appellees that Snody's claims regarding the scope of Dr. Brejar's testimony are completely baseless. During Dr. Brajer's direct examination, Snody's counsel objected only twice on the basis of scope. In the first instance, counsel objected that Dr. Brajer's testimony critical of Snody's expert's opinion was beyond the scope of his report. When Appellees' counsel referred the court to the relevant section of Dr. Brajer's report, counsel withdrew his objection. *See* N.T. Trial, 1/17/19, at 827. In the second instance, counsel objected that Dr. Brajer's testimony regarding Decedent's cause of death was beyond the scope of his written report. Appellees' counsel thereafter rephrased his question and Snody's counsel did not object. *See id.* at 849. Similarly, Snody's complaint regarding Dr. Brajer's criticism of the federal government for its role in creating the opioid crisis is utterly frivolous. Indeed, Dr. Brajer's opinion in that regard was elicited **by Snody's own counsel** on cross-examination. *See id.* at 873-76. Snody's counsel neither objected to Dr. Brajer's testimony nor requested that

it be stricken. Because there is no basis in the record to support Snody's claims regarding Dr. Brajer's testimony, we find them devoid of merit.

Snody next alleges that the trial court erred in denying her motion *in limine* seeking to admit evidence that Dr. Brajer had previously been subject to disciplinary action in the state of Delaware. However, the record is clear that Snody's counsel agreed, prior to trial, to withdraw his request to admit that information:

> THE COURT: And then you also within the motion have sought to include reference to Dr. Brajer's . . . disciplinary matter.
>
> [DEFENSE COUNSEL]: Yes, Your Honor, there was a disciplinary— it's our understanding that there was a disciplinary action that was instituted that has been stayed. And it's that simple. He's going to use the fact that there was an investigation to imply a lack of trustworthiness. There's no outgoing—I mean, if we permit this evidence and in three weeks they come back and drop all the charges, then the jury has just heard highly inflammatory information that was taken out of context. Again—
>
> [PLAINTIFF'S COUNSEL]: I will withdraw that defense on that motion.

N.T. Pretrial Motions Hearing, 12/20/18, at 47. Accordingly, this claim is patently meritless and Snody is entitled to no relief.

Next, Snody asserts that the trial court erred by precluding reference at trial to the fact that Dr. Ettlinger had been investigated by the federal government for his prescribing practices and agreed to pay a $45,000.00 fine. Specifically, Appellees filed a motion *in limine* to bar admission of evidence related to the federal investigation into Dr. Ettlinger as irrelevant and highly prejudicial. **See** Motion *in limine*, 10/9/18, at ¶ 4. Snody argued she was

entitled to introduce that evidence to impeach Dr. Ettlinger's 2017 deposition testimony and as an admission of liability. The trial court concluded that, because the fine paid by Dr. Ettlinger was part of a "no admission" settlement agreement, it did not constitute an admission and was, therefore, irrelevant for that purpose. The court further found that the probative value of the fact that the investigation was conducted was "far outweighed" by the potential prejudicial effect the evidence would have. Trial Court Opinion, 9/9/19, at 12.

At the outset, we note that, once again, Snody fails to specify in her brief the specific deposition testimony she believes to be admissible as impeachment material. However, based on the contents of Appellees' motion *in limine* and the deposition excerpt cited in Appellees' brief, we glean that Snody's claim is based on the following testimony that transpired during counsel's questioning of Dr. Ettlinger regarding his termination from employment with Geisinger Family Practice:

> [PLAINTIFF'S COUNSEL]: Are you aware that you are under any investigation by the Federal Bureau in terms of your dispensing medicine?
>
> A: I found that out [after my termination].
>
> Q: When did you find that out?
>
> A: Within about a month or two afterwards.
>
> Q: So what month or two are we talking about and what year?
>
> A: In May of—after I tried to investigate what led to my termination, I found that out. I'm sorry, that was in May of 2015.
>
> . . .

Q: You have been under investigation or know you have been under investigation since 2015. And you learned that your termination may have been involved with that investigation?

A: That I don't know. They never said to me what the reason for my termination was. I am only surmising that it had to do with [an] incident that I had with someone who was in our office, because it happened within 48 hours.

. . .

Q: As of this point, you have not been charged with anything, is that right?

A: **I have been instructed that I have been cleared of both criminal and civil charges. That is my most recent knowledge**.

Q: That is good for you.

A: Thank you.

Q: You have been cleared of criminal and civil allegations. Is that what you are saying?

A: Right.

Deposition of Dr. Ettlinger, 12/15/17, at 8-10 (emphasis added).

Although the document memorializing Dr. Ettlinger's agreement with the federal government is not included in the certified record,[6] it is apparent that Dr. Ettlinger did not admit liability and that no charges were ultimately brought against him. *See* N.T. Motion *in limine* Hearing, 12/20/18, at 21 ("[DEFENSE COUNSEL]: We obtained a copy of the settlement agreement.

---

[6] An appellant has the duty to ensure that all documents essential to his case are included in the certified record. As we have previously stated, "[i]t is the obligation of the appellant to make sure that the record forwarded to an appellate court contains those documents necessary to allow a complete and judicious assessment of the issues raised on appeal." *Commonwealth v. Walker*, 878 A.2d 887, 888 (Pa. Super. 2005). If a document is not contained in the certified record then this Court cannot take it into account. *Id.*

- 14 -

Subparagraph D of the recital says, quote, this settlement agreement is neither an admission of liability by Dr. Ettlinger, nor a concession by the United States that . . . its claims are not well-founded."). Accordingly, Dr. Ettlinger's statement at his deposition—that he had been instructed that he had been cleared of criminal and civil charge—is not inconsistent with the terms of the agreement he ultimately reached with the federal government. Moreover, by the terms of the agreement itself, Dr. Ettlinger's payment of a $45,000.00 fine does not qualify as an admission of liability. *See id.* Accordingly, we can discern no error of law or abuse of discretion on the part of the trial court in precluding the evidence in question.

Snody next asserts that the trial court erred in granting Appellees' pretrial motion seeking to preclude Snody from referencing the current opioid epidemic in the United States. Snody alleges that such evidence was relevant to establish that Dr. Ettlinger breached the standard of care, as he should have been aware of the epidemic at the time he was prescribing opioid medications to the Decedent. Upon review of the record, we agree with the trial court that counsel's own disregard of the trial court's pretrial order renders this issue moot.

Snody's counsel made his first reference to the opioid crisis less than one page into his opening statement. Specifically, counsel argued as follows:

> ATTORNEY ANGINO: [] My proof will be that starting in 1997 what happened is people started dying from opioids, generally in combination with what they call benzos. They put those two together and it kills people. So the proof in this case will be people started dying.

- 15 -

Records are kept, 1997 through 2012. More and more people died, so that pretty soon there are more people dying from opioids than there are from motor vehicle accidents.

N.T. Trial, 1/14/19, at 67.

Subsequently, during his cross-examination of Dr. Brajer, counsel again made reference to the opioid epidemic during the following exchange:

Q: So you understand that starting in 1997 and for the decade that would follow up until this 2009 period, the number of opioids-related deaths skyrocketed, were you aware?

A: From when?

Q: 1997 to 2007, that decade, do you know that the opioid deaths skyrocketed?

A: They skyrocket even more the following decade.

Q: That's what I'm saying.

A: Right.

Q: And—

A: That's how it works.

Q: And eventually people are dying from opioid deaths higher than automobile accidents. Do you understand that?

A: Oh, yes. We have a horrible national epidemic of opioid abuse and deaths. Yes, awful.

N.T. Trial, 1/17/19, at 872-73.

As these excerpts make it abundantly clear, Snody's counsel violated the trial court's order precluding mention of the opioid crisis and, on multiple occasions, brought it to the jury's attention. Accordingly, Snody cannot now be heard to complain that the trial court erred in its pretrial ruling precluding her from mentioning the opioid epidemic.

Snody next complains that the trial court erred in permitting Appellees' counsel "to openly discuss methamphetamine use [by the Decedent] as a defense in their opening, closing, and questioning of the witnesses." Brief of Appellant, at 40. This claim is waived.

In her argument, Snody refers vaguely to "the opinions of Dr. Boyer and Dr. Brajer regarding causation" and claims that these opinions "lacked a factual basis" and were, somehow, a violation of *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923). However, Snody neither directs our attention to the specific opinion testimony about which she complains, nor explains how such testimony constituted "novel scientific evidence" under *Frye*. Because Snody fails to develop her argument in a way that permits meaningful appellate review, we deem this issue waived. *Wirth v. Commonwealth*, 95 A.3d 822, 837 (Pa. 2014) (where appellate brief fails to develop issue in any meaningful fashion capable of review, claim is waived).[7]

Snody next alleges that the trial court erred in permitting Appellees to introduce inadmissible hearsay evidence that an unidentified family member "stated that [Decedent] had a history of snorting his Xanax." Brief of Appellant, at 43. Once again, Snody fails to specifically identify the

---

[7] Moreover, any error on the part of the trial court in admitting this evidence was necessarily harmless. Snody's argument goes to causation. Here, the jury found Appellees not negligent; accordingly, the issue of causation was never reached. As such, Snody can demonstrate no prejudice. *See Boyle v. Indep. Lift Truck, Inc.*, 6 A.3d 492, 496 (Pa. 2010) (allegations of error are harmless where jury not required to deliberate over issue out of which alleged error arises).

objectionable evidence or testimony, instead opting only to provide parenthetical cites to two pages in the reproduced record. We again remind Snody that it is not the obligation of this Court to scour the record in an attempt to suss out her claim. Nevertheless, our review of the record indicates that Snody's complaint apparently relates to the following testimony elicited by defense counsel:

> Q: Would you agree that there is strong evidence in this case to suggest that [Decedent] died from hypothermia?
>
> [DR. KATHERINE MARGO[8]]: We know he was hypothermic. We don't know that he died of that. . . .
>
> Q: [Reading from medical records] Said: Family spoke with Paramedic Cotner in the ER and they report that they hadn't spoken to the patient since Wednesday and that he was a known drug—has a known drug history of snorting Xanax and multiple other drugs.
>
> Did I read that correctly?
>
> A: That's what it says.

N.T. Trial, 1/15/19, at 393-94.

> Q: And if it [sic] we look at the top of the page, we see a 15, family members reported that [Decedent] has a history of abusing drugs, including snorting alprazolam and multiple other drugs?
>
> Tell me where you got that information.

---

[8] Katherine Margo, M.D., testified as an expert in family medicine on behalf of Snody.

- 18 -

[DR. EDWARD BOYER[9]]:    That information is from the medical record.

N.T. Trial, 1/18/19, at 1002.

It is well-settled law that "[i]n order to preserve an issue for review, a party must make a timely and specific objection." ***Commonwealth v. Duffy***, 832 A.2d 1132, 1136 (Pa. Super. 2003); ***see also*** Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").   Here, Snody does not point to any such timely objection and our review of the record does not reveal one.   Accordingly, this issue is waived.[10]

Snody next complains that the trial court erred by precluding her toxicologist, William Sawyer, Ph.D, from testifying as to the standard of care

---

[9] Doctor Boyer testified on behalf of Appellees as an expert in emergency medicine and toxicology.

[10] Even if not waived, this claim would be meritless.  The statements regarding Decedent's history of snorting Xanax were contained in the "trip sheet" of a flight nurse who provided treatment to Decedent in an attempt to save his life.  Pennsylvania Rule of Evidence 803(4) provides that statements made for the purposes of medical diagnosis or treatment, regardless of whether the declarant is available, is admissible as substantive evidence where:  (1) the statement was made for the purpose of receiving medical treatment; and (2) the statement was necessary and proper for diagnosis and treatment. ***Commonwealth v. Belknap***, 105 A.3d 7, 11 (Pa. Super. 2014) (citations omitted).  Statements made by family members to a flight nurse endeavoring to save their loved-one's life falls squarely within this exception to the hearsay rule.

of a family practice physician prescribing opioids. The trial court properly disposed of this claim as follows:

> The [c]ourt did not err in precluding [Snody's] Ph[.]D toxicologist from testifying as to the standard of care of a family practice physician prescribing opioids and other medications, as the MCARE Act and the Pennsylvania Supreme Court specifically mandate[] that the possession of an unrestricted license to practice medicine is a requirement, which cannot be waived, and is necessary to offer standard of care opinions. *See* 40 P.S. [§] 1303.512(b); ***Wexler v. Hecht***, 928 A.2d 973, [975 n.3] (Pa. 2007).

Trial Court Opinion, 9/9/19, at 14.

Indeed, Snody's counsel acknowledged that Dr. Sawyer was not present to testify as to standard of care:

> [ATTORNEY ANGINO]: Doctor, you have a Ph.D; is that right?
>
> A: Yes.
>
> Q: Not an M.D., right?
>
> A: Correct.
>
> Q: Do most toxicologists have Ph.Ds rather than M.D.s?
>
> A: Yes.
>
> Q: So when you were asked on cross-examination whether you were a doctor, **you're not here to testify as to whether Dr. Ettlinger was negligent. That's not your function; is that right?**
>
> A: **No. I am not here to testify on standard of care. That's not my specialty.**

N.T. Trial, 1/17/19, at 692 (emphasis added).

Accordingly, not only was Dr. Sawyer properly precluded from providing standard of care testimony, he was not presented for that purpose and the claim is waived.

Next, Snody asserts that the verdict was against the weight of the evidence. This claim is also waived.

Snody's argument on this issue consists of one page in her appellate brief. The first paragraph sets forth the standard for setting aside a jury verdict. The second paragraph baldy argues that, because Decedent did not take opioid drugs prior to treating with Dr. Ettlinger, and because Dr. Ettlinger prescribed opioid and benzodiazepine drugs to Decedent for five and one-half years, "Dr. Ettlinger is clearly negligent" for failing to follow unspecified "guidelines as outlined above in the Statement of the Case[]." Brief of Appellant, at 50. This pronouncement is followed by an extensive string of citations to broad swaths of the reproduced record. Once again, Snody has failed to provide a well-developed argument with specific citations to the record, supported by reference to pertinent law. Accordingly, we agree with Appellees that Snody's "undeveloped and editorialized challenge to the jury's verdict is nothing more than a disagreement with the jury's resolution of the factual issues" and, as such, garners her no relief. Brief of Appellees, at 31.

Snody's final issue on appeal concerns the trial court's decision to send the jury out to deliberate at 5:00 p.m. on the Friday before a three-day weekend. Once again, Snody has failed to provide any citation pointing this Court to that portion of the record giving rise to her complaint. Appellees

kindly provide us with what Snody does not, and note that Snody's counsel failed to raise any objection whatsoever to the court's discharging the jury to deliberate. Indeed, earlier in that day's proceedings, the following exchange transpired between the court and counsel:

> THE COURT: Okay. And then we will close, charge; the case will go to the jury today.
>
> [DEFENSE COUNSEL]: Yes, sir.
>
> THE COURT: **We will keep them as long as it takes**. So with than in mind, we'll see you in a couple minutes.
>
> [SNODY'S COUNSEL]: We had a case one time in Perry County that the jury came in at 2:00 a.m. So we don't do much of that anymore, but—
>
> THE COURT: No.
>
> [SNODY'S COUNSEL]: **I'm just suggesting there is some precedent for staying for awhile**.
>
> THE COURT: Well, their option would be to come back Tuesday.
>
> [SNODY'S COUNSEL]: **We don't want that option**.

N.T. Trial, 1/18/19, at 919.

As this excerpt makes clear, counsel not only failed to object when the jury was discharged, he explicitly expressed a preference for requiring the jury to "stay[] for awhile" and deliberate that evening. Accordingly, Snody's final claim is patently meritless.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>04/21/2020</u>